Richard (Dick) STONE,
Plaintiff-Appellant,

v.

EXPORT–IMPORT BANK OF the UNITED STATES et al.,
Defendants-Appellees.

No. 75–2575.

United States Court of Appeals,
Fifth Circuit.

May 13, 1977.

Rehearing and Rehearing En Banc Denied June 23, 1977.

---

Thomas A. Capelle, San Francisco, Cal., Michael Sierra, Tampa, Fla., for plaintiff-appellant.

Leonard Schaitman, Thomas G. Wilson, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for Export-Import Bk.

W. DeVier Pierson, Mark E. Greenwood, Washington, D. C., for amicus curiae.

Before MORGAN and FAY, Circuit Judges, and HUNTER,* District Judge.

LEWIS R. MORGAN, Circuit Judge:

The question in this case is whether the Bank for Foreign Trade, an agency of the Soviet Union, is a "person" within the meaning of the fourth exemption of the Freedom of Information Act, 5 U.S.C. § 552(b)(4). We hold that it is.

* Senior District Judge of the Western District of Louisiana, sitting by designation.

1. It is Eximbank's policy to share financing of particular export programs with private Ameri-

## I. FACTS.

The Export-Import Bank of the United States, an independent federal agency, is a banking corporation that helps facilitate and finance exports and imports between the United States and other countries. *See generally* 12 U.S.C. § 635 *et seq.*; 12 C.F.R. § 402.1. Eximbank, as it is known, derives its funds primarily from the sale of debentures in the private market, and not from congressional appropriations. The Bank is managed by a five-member board of directors appointed by the President with advice and consent of the Senate.

In 1972 the Bank for Foreign Trade, an agency of the Soviet Union, approached Eximbank for help in financing the export from the United States of goods and services for use in the construction of an ammonia manufacturing facility in the Soviet Union. In June of 1973, after negotiations, Eximbank issued a preliminary commitment for credit of $180 million to the Bank for Foreign Trade. At the same time, the Bank for Foreign Trade negotiated a separate agreement with a consortium of private lenders, headed by the Bank of America, for the extension of an additional $180 million credit to be used for the construction project.

Late in the summer of 1973, during discussions between the Bank of America and Eximbank concerning coordination of the two credits, Eximbank proposed that the two credits be consolidated into a single loan agreement among the Bank of America consortium, Eximbank, and the Bank for Foreign Trade.[1] The proposal was agreeable to all parties, and on May 21, 1974, after some further negotiations, the three parties executed a consolidated final loan agreement.

On July 2, 1974 plaintiff Senator Richard (Dick) Stone, then a candidate for the United States Senate from Florida, requested that Eximbank furnish him a copy of the

can commercial lenders. When it does so, it prefers that the loan agreements be consolidated, as here. Record at 19–20.

loan agreement. William J. Casey, chairman of Eximbank, denied the request on the ground that the loan agreement was confidential and could not be disclosed without the consent of the other parties to the agreement.[2] Plaintiff sought such consent from the Bank for Foreign Trade, but it

was refused. Eximbank did, however, provide plaintiff with copies of the resolution adopted by Eximbank's board of directors approving the loan, which sets forth its basic terms,[3] and of the press release that Eximbank issued the day the loan agreement was executed.[4]

2. Eximbank's Freedom of Information regulations specifically exempt its loan agreements from disclosure. 12 C.F.R. § 404.3(c)(4).

3. The resolution stated:

WHEREAS, the financing set forth below will facilitate exports and imports and the exchange of commodities between the United States and the Soviet Union;

NOW, THEREFORE, BE IT RESOLVED, that in order to enable Vneshtorgbank of the U.S.S.R. (the Borrower) to assist Techmashimport and Promsyrioimport in financing the acquisition in the United States and exportation to the Soviet Union of equipment, related materials and services to be used for the construction of an ammonia manufacturing complex, storage and transportation facilities for ammonia and superphosphoric acid and related facilities, there is hereby authorized the establishment by Export-Import Bank of the United States (Eximbank) of a line of credit (the Eximbank Credit) in favor of the Borrower of not to exceed the lesser of US$180,000,000 or 45% of the U.S. costs, subject to the following terms and conditions:

1. *Commercial Loan.* One or more lenders acceptable to Eximbank shall agree to lend US$180,000,000 to the Borrower on terms and conditions satisfactory to Eximbank to assist the Borrower in financing the U.S. costs.

2. *Repayment.* The Borrower shall repay the aggregate of the advances under the Eximbank Credit and the Commercial Loan in 24 approximately equal semiannual installments beginning on May 20, 1979, of which the first 12 shall be applied to repayment of the Commercial Loan and the last 12 to repayment of the Eximbank Credit.

3. *Interest.* The Eximbank Credit shall bear interest at the rate of 6% per annum, payable semiannually.

4. *Commitment Fee.* The Borrower shall be charged a commitment fee of ½ of 1% per annum computed from 60 days after the adoption of this resolution, on the undisbursed amount of the Eximbank Credit from time to time outstanding.

5. *Cash Payment.* The borrower shall make a cash payment from non-U.S. sources of not less than 10% of the U.S. costs.

6. *Supply Contracts.* Eximbank shall be furnished with copies of the contracts for the purchase of the items to be financed under the Eximbank Credit and the Commercial Loan.

7. *Disbursement.* The Eximbank Credit and the Commercial Loan shall be disbursed *pari passu.*

8. *Guarantee.* Due and punctual payment of all amounts owing by the Borrower to Eximbank shall be guaranteed unconditionally by the Government of the Union of Soviet Socialist Republics.

9. *Availability.* Advances shall not be made subsequent to December 31, 1978, except to the extent that a duly authorized officer of Eximbank may consent in writing.

10. *Other Terms and Conditions.* Such other terms and conditions as Eximbank may deem advisable.

RESOLVED FURTHER, That the President, First Vice President, a Director, the Executive Vice President, the General Counsel or a Senior Vice President be and he is hereby authorized to execute such agreement or agreements to take such other action as he may deem necessary or convenient to carry this resolution into effect;

RESOLVED FURTHER, that the Senior Vice President and Treasurer-Controller, the Deputy Treasurer, or an Assistant Treasurer be and he is hereby authorized to make disbursements from time to time in accordance with the terms of this resolution and any agreement or agreements executed pursuant hereto.

4. The press release stated:

U.S. EXPORT SALES OF $400 MILLION PLUS ENERGY AND FERTILIZER BENEFITS PROMISED BY EXIMBANK CREDIT OF $180 MILLION TO THE U.S.S.R.

William J. Casey, Chairman of Export-Import Bank of the United States, announced today that the Bank's Directors have authorized a credit of $180 million to the Bank for Foreign Trade of the U.S.S.R. (Vneshtorgbank). This credit will not only assist in the export of $400 million of U.S. goods, but also promises major additional benefits in saving natural gas and bringing needed fertilizer to the United States.

Eximbank will be involved only in financing U.S. exports, but this transaction is part of a program between the Soviet Union and American companies under which superphosphoric acid, which the U.S. has in relative abundance, will be shipped to the Soviet

Plaintiff thereupon filed suit against Eximbank and its president in federal district court under the Freedom of Information Act, 5 U.S.C. § 552, seeking to compel disclosure of the agreement. Eximbank filed a motion for summary judgment together with an affidavit of its general counsel. The motion asserted that the loan agreement was protected from disclosure by the fourth exemption of the Act, 5 U.S.C. § 552(b)(4), which exempts "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Plaintiff, taking the position that any loan agreement between Eximbank and the Bank for Foreign Trade was not within this exemption, moved the district court to conduct an *in camera* examination of the consolidated loan agreement to determine whether the terms of the loan by Eximbank to the Bank for Foreign Trade could be separated from the terms of the loan by the Bank of America consortium to the Bank for Foreign Trade, and whether any material pertaining to the latter loan was not exempt from disclosure. The Bank of America filed an amicus memorandum opposing disclosure of any part of the consolidated loan agreement, together with an affidavit of its senior vice president in charge of lending to European borrowers.

Union and two nitrogen fertilizers (ammonia and urea) which are scarce here, plus potash, will come to the U.S. This nitrogen fertilizer will be made with Soviet natural gas.

To manufacture the needed fertilizer here would require a drain on U.S. natural gas reserves in an amount large enough to heat a million U.S. homes a year.

The ammonia and urea imported into the U.S. will have an energy content equivalent to 25.2 million barrels of crude oil per year. For every BTU (British Thermal Unit) of energy used for the phosphates exported, ammonia, urea and potash requiring at least 50 BTU's of energy will be imported by the United States.

Occidental Petroleum or its affiliates plan to invest more than a half billion dollars in the U.S. to construct ships and to expand production facilities to mine and process phosphate rock in Florida. It is estimated that this will create two to three thousand jobs during the construction period until 1979, and 2900 permanent jobs thereafter.

In addition to the sale of at least $400 million in U.S. equipment and supplies, the project should provide substantial balance-of-trade advantages for the U.S. resulting from the trade of commodities. The transaction contemplates that the U.S. would acquire needed fertilizer from abroad not for cash but in return for exporting materials in ample supply here, thus avoiding a net drain on America's trade balance.

The materials purchased from American companies with the assistance of this financing will be used in the construction of ammonia plants, storage facilities, pumping stations, railroad tank cars and a 1200 mile pipeline in the U.S.S.R. Private financing in the amount of another $180 million will be provided by a consortium of U.S. commercial banks headed by Bank of America, without Eximbank's guarantee. The borrower will make a cash down payment of $40 million, which is 10% of the balance of the U.S. costs.

Proceeds of the Eximbank and commercial bank credits will be applied against purchases from U.S. companies by Techmashimport and Promsyrioimport of the U.S.S.R. Some of the possible major suppliers include: Babcock and Wilcox Company, New York, N.Y., Bechtel Corporation, San Francisco, Cal., Chemical Construction Company, New York, N.Y., Chicago Bridge and Iron Company, Oakbrook, Ill., General Electric Company, New York, N.Y., Honeywell, Inc., Minneapolis, Minn., Ingersoll-Rand Company, Woodcliff Lake, N.J., Kaiser Steel Corporation, Oakland, Cal., Occidental Petroleum Corporation, Los Angeles, Cal., Union Carbide Corporation, New York, N.Y., Union Tank Car Company, Chicago, Ill., and Westinghouse Electric Company, Pittsburgh, Pa.

The ammonia and urea plants which will be located at Togliatti and Kuybyshev, and the pipeline which will extend from the plant sites to Odessa, are expected to be completed by December 1978. U.S. exports of superphosphoric acid are expected to commence sometime in 1978. U.S. imports of ammonia, urea and potash will begin at the same time.

The credits are to be repaid in 24 semi-annual installments beginning May 20, 1979, with Eximbank's direct credit of $180 million to be repaid out of the last 12 installments. The Soviet bank will pay interest on outstanding balances at an annual rate of 6% which was the rate Eximbank charged on its loans when a Preliminary commitment was issued on this transaction last year. The blended interest rate of Eximbank's loan and the loans extended by the U.S. commercial banks to Vneshtorgbank will be, at present prime rate levels, approximately 7.8% per year. Repayment of Eximbank's credit is to be guaranteed by the government of the Union of Soviet Socialist Republics.

After further briefing, and without the requested *in camera* examination, the district court granted Eximbank's motion for summary judgment, holding that the loan agreement was exempt from disclosure in its entirety. Plaintiff appeals.

## II. DISCUSSION.

█ On this appeal, plaintiff does not seek disclosure of the terms of the loan by the Bank of America consortium to the Bank for Foreign Trade. Instead, he seeks disclosure only of that portion of the consolidated loan agreement that sets forth the terms of the loan by Eximbank to the Bank for Foreign Trade. Plaintiff concedes that this portion of the agreement contains "commercial or financial information" within the meaning of § 552(b)(4). Brief for Appellant at 10; Reply Brief for Appellant at 4 n. 9. His argument is that the Bank for Foreign Trade is not a "person" within the meaning of the Act, so that the commercial or financial information reflected in the loan agreement was not "obtained from a person."

The core of plaintiff's argument is that Congress' intent in enacting the fourth exemption was to protect only American citizens and businesses, and not citizens, businesses, or agencies of a foreign country. He points to no legislative history disclaiming an intention to protect non-Americans. Instead, he relies on the absence of legislative history expressly embracing such an intention. He also points to the fact that the Senate Committee substituted the word "person" for "public" in § 552(b)(4) when it reported out the bill that became the Freedom of Information Act. *See* S.Rep.No.813, 89th Cong., 1st Sess. 2 (1965). He argues that the term "public" would not have included foreign nationals or entities and that the substitution of "person" was not intended to broaden the scope of the fourth exemption.[5]

What all this overlooks is that the term "person" is defined for purposes of § 552 in § 551, a fact of which we must assume Congress was aware:

For the purpose of this subchapter—

. . . . .

(2) 'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency; . . .

"Agency" does not include an agency of a foreign government, § 551:

For the purpose of this subchapter—

(1) 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include [specified exemptions].

█ Nothing in this definition of "person" suggests an intention to limit its plain terms to *American* individuals and "public or private" organization. The two courts that have touched upon the question have declined to hold that foreign citizens or entities are not "persons" within the purview of § 551(2). *See Constructores Civiles de Centroamerica, S.A. (Concica) v. Hannah*, 148 U.S.App.D.C. 159, 459 F.2d 1183, 1190 & n. 4 (1972) ("[T]he Administrative Procedure Act uses the words 'any person' not 'any citizen,'" citing 5 U.S.C. § 551(2)); *Neal-Cooper Grain Co. v. Kissinger*, 385 F.Supp. 769, 776 (D.D.C.1974) (holding Mexican government is a "person" within meaning of 5 U.S.C. §§ 551(2) and 552(a)(3)).

Moreover, it appears that Congress was, in fact, given notice by the Comptroller General that use of the word "person" in the Freedom of Information Act would bestow rights under the Act on non-Americans. *See Hearings on S. 1160 et al. before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary*, 89th Cong., 1st Sess., at 376 (1965).[6] Finally, in enacting the Privacy

---

5. In support of the latter argument, plaintiff cites S.Rep.No.813, *supra*, at 2: "The words 'any person' were substituted for the words 'the public' in order to convey the idea that 'highly personal' information may be involved."

6. In his letter to the subcommittee the Comptroller General stated:

Act of 1974, 5 U.S.C. § 552a, Congress demonstrated its awareness of the breadth of the term "person" as defined in § 551(2) by using, instead, the term "individual," defined as "a citizen of the United States or an alien lawfully admitted for permanent residence." 5 U.S.C. § 552a(a)(2); *see* S.Rep.No.1183, 93d Cong., 2d Sess. 79 (1974).[7]

In sum, we find no warrant for reading into either § 552(b)(4) or § 551(2) a limitation on the term "person" that Congress neither put there nor demonstrated any intention to put there. We hold that § 552(b)(4) is not limited to protecting information obtained only from American citizens or organizations, and therefore reject plaintiff's argument that information obtained from the Bank for Foreign Trade is not information obtained "from a person" within the meaning of § 552(b)(4). We therefore affirm the judgment of the district court.[8]

AFFIRMED.

---

[W]e believe the reference to 'any person' [in § 552(a)(3)] is too broad. This language would make it mandatory for an agency to open its records to subversives, aliens—even enemy aliens, to claim hunters, and to others whose interests might be adverse to the Government. We think that the individuals being given access to Government records should, at least, be citizens of the United States . . .

7.  The Senate Report stated:

[The] term ['individual'] is used instead of the term 'person' throughout the bill in order to distinguish between the rights which are given to the citizen as an individual under this Act and the rights of proprietorships, businesses and corporations which are not intended to be covered by this Act . . . . . This definition was also included to exempt [from] the coverage of the bill intelligence files and data banks devoted solely to foreign nationals or maintained by the State Department, the Central Intelligence Agency and other agencies for the purpose of dealing with nonresident aliens and people in other countries.

8.  As an apparent afterthought, plaintiff also asserts that the loan agreement between Eximbank and the Bank for Foreign Trade is not "privileged or confidential" within the meaning

of § 552(b)(4). *See* Brief for Appellant at 14–15; Reply Brief for Appellant at 2. This assertion, like his argument that the Bank for Foreign Trade is not a "person," is premised on a supposed legislative intent to protect only United States citizens and businesses in the Act's fourth exemption. *See* Brief for Appellant at 10–12, 14–15; Reply Brief for Appellant at 2. For the reasons stated above, we find no support for this assertion.

Plaintiff does *not* argue that a loan agreement negotiated between a borrower who is a "person" and a government lender—as distinguished from data submitted by the borrower to the government lender in order to qualify for the loan—is not "privileged or confidential" within the meaning of § 552(b)(4). *See* S.Rep. No.813, *supra*, at 9 ("Specifically it [the fourth exemption] would include any commercial, technical, and financial data, submitted by an applicant or a borrower to a lending agency in connection with any loan application or loan."); H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1965) ("It [the fourth exemption] would include information customarily subject to the . . . lender-borrower privilege such as technical or financial data submitted by an applicant to a Government lending or loan guarantee agency."). We therefore intimate no opinion on that question.