COMSTOCK INTERNATIONAL
(U.S.A.), INC., Plaintiff,

v.

EXPORT–IMPORT BANK OF the
UNITED STATES, Defendant.

Civ. A. No. 78–1107.

United States District Court,
District of Columbia.

Feb. 7, 1979.

Anthony C. J. Nuland, Washington, D. C., for plaintiff.

Florence E. Abrams, Special Asst. U. S. Atty., Washington, D. C., for defendant.

Daniel J. Plaine, Allan Gates, Washington, D. C., for amicus Sonatrach.

## MEMORANDUM

GASCH, District Judge.

Plaintiff Comstock International (U.S.A.), Inc. ("Comstock"), an American corporation, has brought this action under the Freedom of Information Act ("FOIA")[1] to compel defendant to release certain identified documents held by it. Defendant Export-Import Bank of the United States ("Eximbank"), an independent federal agency, is a banking corporation that seeks to facilitate and finance exports and im-

ports between the United States and other countries. *See* 12 C.F.R. § 402.1(a) (1978). To accomplish this purpose Eximbank extends loans, guarantees, and other forms of financial assistance. This Court has jurisdiction over the matter under 5 U.S.C. § 552(a)(4)(B).

## FACTUAL BACKGROUND

In June, 1974, Eximbank executed a loan agreement by which it made available a line of credit for over $21 million in favor of Sonatrach ("Societe Nationale pour la Recherche, la Production, le Transport, la Transformation et la Commercialisation des Hydrocarbures"), a national oil and gas development company wholly owned by the Republic of Algeria. The agreement also provided that Eximbank would guarantee a line of credit in an equal amount to be made by Chase Manhattan Bank.

Sonatrach planned to use the funds to expand the capacity of an oil pipeline from the Haoud El Harma oil field to the port of Skikda in Algeria. The construction work on the pipeline was to be performed by a consortium of firms, which included plaintiff. The General Electric Company ("GE"), which had formed the consortium, was to supply equipment and other firms would provide various engineering and technical services. During 1974–1975, pursuant to the terms of the loan agreement, Sonatrach and GE submitted at least five progress reports regarding the construction project to Eximbank.

■ On January 30, 1978, plaintiff made a request under the FOIA that Eximbank release documents pertaining to loans made by it to Sonatrach, including the Pipeline loan.[2] Although defendant released a large number of documents relating to the loan

---

1. 5 U.S.C. § 552 *et seq.* (1976).

2. Although Comstock originally was a member of the pipeline consortium, it withdrew prior to the start of construction. The issues raised by Comstock's withdrawal are the subject of an arbitration proceeding brought by Sonatrach to recover damages from Comstock that is currently pending before the International Chamber of Commerce in Paris, France (Arbitration No. 3241). *See* Affidavit of Harold A. Jerry, III

in Support of Motion for Leave to File a Brief as Amicus Curiae, ¶ 4. Plaintiff presumably seeks the documents at issue here for use in this arbitration proceeding, but a party's rights under the FOIA are neither enhanced nor diminished by its status as a private litigant. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 n. 23, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978).

agreement, other documents were withheld.[3] On March 10, 1978, plaintiff filed an administrative appeal of the refusal to release the following documents:

Progress Report, Feb. 27, 1975, GE, with attachments;

Progress Report, Sept. 14, 1976, Sonatrach, with attachments;

Progress Report, March 3, 1976, GE, with attachments;

Progress Report, Jan. 31, 1976, Sonatrach, with attachments;

Progress Report, Oct. 31, 1976, Sonatrach, with attachments; and

Loan Agreement among Sonatrach, Chase Manhattan Bank and Eximbank, June 10, 1974, Eximbank Credit No. 4997.[4]

All of these documents relate to the construction project financed by the Eximbank loan. The Loan Agreement details the terms and conditions under which Eximbank and Chase Manhattan Bank extended credit to Sonatrach for the purchase of goods and services for the Skikda project. The progress reports describe the progress of construction by the five-member construction consortium led by General Electric.

On April 11, 1978, Eximbank notified plaintiff that the documents in question would continue to be withheld on the basis of the commercial and financial information exemption to the FOIA. 5 U.S.C. § 552(b)(4). Having exhausted its administrative remedies, plaintiff instituted this lawsuit on June 16, 1978. Presently before the Court are the parties' cross-motions for summary judgment. Sonatrach has filed a brief as *amicus curiae* and supporting affidavits opposing disclosure of the loan agreement and progress reports.

## MERITS

When a government agency seeks to withhold information as exempt from disclosure under the FOIA, it must provide detailed justification for its action, specifically identifying reasons why the particular exemption is relevant and relating those claims to the particular part of the withheld documents to which they apply. *Mead Data Central, Inc. v. Department of the Air Force,* 184 U.S.App.D.C. 350, 359, 566 F.2d 242, 251 (1977). Here Eximbank has based its refusal to release the requested documents on exemption (b)(4) to the FOIA, which states:

This section [directing disclosure] does not apply to matters that are—

.　　.　　.　　.　　.

trade secrets and commercial or financial information obtained from a person and privileged or confidential　.　.　.　.

5 U.S.C. § 552(b)(4). The agency bears the burden of establishing that the information it seeks to withhold falls within the scope of an exemption. 5 U.S.C. § 552(a)(3)(B).

There is little dispute that the loan agreement and the progress reports represent commercial or financial information. The requirement that the information be obtained from a person is also satisfied in this case because the applicable definition of "person" includes "an individual, partnership, corporation, association, or public or private organization　.　.　.　." 5 U.S.C. § 551(2). The United States Court of Appeals for the Fifth Circuit recognized this fact in a recent case involving information

---

**3.** The documents produced included copies of the resolution of Eximbank's Board of Directors authorizing the loan and the letter to Sonatrach describing its action. These documents contain the major elements of the loan agreement, setting forth the amount of the loan, its term, the rate of interest, and the amount of fees charged. Eximbank, with the consent of Sonatrach, also has disclosed portions of the progress reports revealing the identity, location, and scope of the project, members of the consortium, the responsibilities of individual consortium members, and the methods by which the objectives of the contract are to be achieved.

**4.** These documents were identified as those being withheld in a letter dated February 28, 1978 from Ross M. Delston, Counsel to Eximbank, to plaintiff's attorneys, who were subsequently informed by letter dated April 26, 1978 that an undated report was annexed to the progress report dated October 31, 1976. For purposes of this proceeding, both reports are referred to as the October 31, 1976 report.

submitted to Eximbank by holding that an agency of the Soviet Union was a person within the meaning of exemption (b)(4). *Stone v. Export-Import Bank of the United States,* 552 F.2d 132, 133 (5th Cir. 1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). Because no generally recognized claim of privilege is applicable to the documents at issue here,[5] the central question presented by the cross-motions for summary judgment is whether the information contained in these documents is confidential.

The United States Court of Appeals for the District of Columbia Circuit has defined the criteria for determining whether information can be deemed confidential. After reviewing the legislative history to ascertain the purposes of the exemption, the Court held that commercial or financial information is confidential for purposes of this exemption if disclosure of the information is likely to have either of the following results: (1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information is obtained. *National Parks & Conservation Ass'n v. Morton,* 162 U.S.App.D.C. 223, 228, 498 F.2d 765, 770 (1974) (*National Parks I*).

■ Because conclusory and generalized allegations are unacceptable as a means of sustaining the burden of nondisclosure under the FOIA, specific factual or evidentiary material is required to support application of the (b)(4) exemption. *Pacific Architects & Engineers, Inc. v. The Renegotiation Bd.,* 164 U.S.App.D.C. 276, 278, 505 F.2d 383, 385 (1974). This requirement must be satisfied for each document or class of documents sought to be withheld.

### A. The Loan Agreement.

Eximbank opposes release of the loan agreement on the ground that its disclosure would cause substantial harm to the competitive positions of the two commercial parties involved in the transaction, Chase and Sonatrach. Alternatively, it suggests that the loan agreement should be withheld because it represents information not customarily released to the public by the person from whom it was obtained.[6]

In *National Parks I* the Court considered this latter argument and concluded that a determination that the information "would not generally be made available for public perusal" does not, by itself, support application of the financial information exemption. 162 U.S.App.D.C. at 228, 498 F.2d at 770. It stated that the district court also must inquire into the possibility that disclosure will harm legitimate private or governmental interests in secrecy. *Id.* The General Counsel of Eximbank has stated that commercial banking institutions as a worldwide practice afford loan agreements strict confidentiality and Eximbank as a lending institution does the same.[7] Although this fact must be weighed in applying the exemption, it does not end the Court's inquiry.

The Court of Appeals in *National Parks I* suggested that the most common governmental interest threatened by disclosure of commercial and financial information would be the Government's ability to obtain similar necessary information in the future. 162 U.S.App.D.C. at 228, 498 F.2d at 770. This interest is not affected here, for the information contained in the loan agreement is not submitted to the government but rather generated by it through Eximbank's participation in the negotiation proc-

---

5. Sonatrach has suggested that the borrower-lender relationship is covered by the exemption (b)(4) concept of privilege even though it is not a generally recognized testimonial privilege. Memorandum of Amicus Curiae Sonatrach in Support of Defendant's Cross-Motion for Summary Judgment at 12 n. 15. It claims that this privilege is based on the traditional practice and obligation of banks to keep confidential information provided by their customers. The

Court expresses no opinion on the merits of this argument.

6. Eximbank's FOIA regulations specifically exempt its loan agreements from disclosure. 12 C.F.R. § 404.3(c)(4) (1978).

7. Affidavit of Warren W. Glick in Support of Defendant's Cross-Motion for Summary Judgment (Glick Affidavit), ¶ 3.

ess. The *National Parks I* court, however, expressly left open the possibility that other governmental interests, such as the interest in program effectiveness, are embodied by this exemption. *Id.* at 162 U.S.App.D.C. at 228, 498 F.2d 770 n. 17.[8]

Eximbank maintains that disclosure would significantly impair its ability to promote United States exports. Because Eximbank competes in the world market with other government-supported export credit unions that are not required to disclose financing agreements to outside parties, potential loan applicants might seek financing outside the United States because of their unwillingness to subject themselves to the possible risk of disclosure.[9] Eximbank also argues that disclosure would also impair its effectiveness by making it more difficult to negotiate loan agreements because borrowers would be less inclined to make concessions that could be disclosed to a future lender. In addition, disclosure of loan agreements would discourage commercial bank participation with Eximbank on joint loan agreements, thus impairing Eximbank's ability to control overall financing of transactions.[10]

■ The Court concludes that the affidavits offered by Eximbank offer "specific factual or evidentiary material" to satisfy defendant's burden of proving that circumstances justify nondisclosure of the loan agreement. A similar result was upheld by the Fifth Circuit, which affirmed the district court's holding that an Eximbank loan agreement was exempt from disclosure in its entirety. *Stone v. Export-Import Bank of the United States,* 552 F.2d 132, 137 (5th Cir. 1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). The only issue raised on appeal in *Stone,* however, was whether an agency of a foreign government was a person within the meaning of exemption (b)(4). *Id.* at 133.[11]

### B. *The Progress Reports.*

Eximbank seeks to prevent disclosure of the five progress reports submitted to it in 1974 and 1975 on the grounds that disclosure will impair its ability to obtain similar necessary information in the future and that it will result in substantial harm to the competitive position of the suppliers of the information.

As support for its position, Eximbank relies on the legislative history accompanying the FOIA. In discussing the scope of the (b)(4) exemption, the House Government Operations Committee stated:

> [The exemption] would include information customarily subject to the doctor-patient, lawyer-client, or lender-borrower privileges such as technical or financial data submitted by an applicant to a Government lending or loan guarantee agency.

H.R.Rep.No.1497, 89th Cong., 2d Sess. 10, *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 2418, 2427.

A similar view is expressed in the Senate Report accompanying the FOIA:

> Specifically [the exemption] would include any commercial, technical, and financial data, submitted by an applicant or a borrower to a lending agency in connection with any loan application or loan.

S.Rep.No.813, 89th Cong., 1st Sess. 9 (1965).

Progress reports are required as a general practice for every direct credit transaction involving United States procurement to enable Eximbank to ascertain the status of a project and to function as an "early-

---

**8.** The *National Parks II* opinion also refused to express an opinion whether other government interests are served by the (b)(4) exemption. *National Parks & Conservation Ass'n v. Kleppe,* 178 U.S.App.D.C. 376, 381, 547 F.2d 673, 678 n. 16 (1976).

**9.** *See* Glick Affidavit, ¶ 7(c).

**10.** *Id.,* ¶ 7(d)–(e).

**11.** The Fifth Circuit noted, however, that "[p]laintiff does *not* argue that a loan agreement negotiated between a borrower who is a 'person' and a government lender . . . is not 'privileged or confidential' within the meaning of § 552(b)(4). . . . We therefore intimate no opinion on that question." *Id.* at 137 n. 8 (emphasis in original).

warning system" regarding possible problems.[12] They clearly represent data submitted by "a borrower to a lending agency in connection with any . . . loan." But under the current test of confidentiality established in *National Parks I*, it is still necessary to consider whether their release would impair Eximbank's ability to obtain such information in the future or cause substantial harm to the competitive position of the supplier.

Eximbank argues that disclosure of the progress reports would impair its ability to obtain similar information in the future because although reporting is required as a condition of the loan, the scope and amount of detail of the progress reports are left to the discretion of the borrower. To encourage full and objective reporting, Eximbank maintains the reported information in confidence and does not disclose it to third parties without the consent of the borrower.[13]

In response plaintiff argues that this situation is governed by the conclusion reached in *National Parks I* that the government has no apparent interest in preventing disclosure of the information. Because the information at issue in that case was a mandatory condition of the concessioners' right to operate in national parks and they were required to provide the information by statute, the Court concluded that "there is presumably no danger that public disclosure will impair the ability of the Government to obtain this information in the future." 162 U.S.App.D.C. at 228, 498 F.2d at 770. Plaintiff argues that the Court did not distinguish between information supplied pursuant to "statute, regulation or some less formal mandate"[14] and that the latter category would include progress reports required as a condition of the loan.

■ On the basis of the evidence presented to it, the Court concludes that because Eximbank can mandatorily condition loan approval on submission of progress reports, disclosure of such reports will not seriously impair its ability to obtain such information. Eximbank's fear that the reports will become less candid because of the possibility of disclosure may be valid, but if so, the agency can remedy this problem by making its reporting requirements more specific.

■ The requirement of confidentiality can also be satisfied if the second prong of the *National Parks I* standard can be met. In a FOIA action in which the principal issue is whether disclosure of the requested documents would cause substantial competitive harm to a party seeking to avoid disclosure, such party is required to prove that it actually faces competition and that substantial competitive injury will likely result from disclosure. *National Parks and Conservation Ass'n v. Kleppe,* 178 U.S.App.D.C. 376, 382, 547 F.2d 673, 679 (1976) *(National Parks II).*

Although Sonatrach is a state-owned monopoly, it claims that it competes with oil producers outside of Algeria. Plaintiff responds that Algeria is one of thirteen members of the Organization of Petroleum Exporting Countries (OPEC), which controls approximately eighty-two percent of the noncommunist world's oil supply.[15] Two of the five progress reports were prepared and submitted by GE in its role as contractor for Sonatrach. There apparently is no dispute that GE faces competition in its business activities.

Although a detailed economic analysis relating to the existence of competition in some circumstances might be relevant and material under the second prong of the *National Parks I* test of confidentiality,[16] it

---

12. Affidavit of John A. Brois, Eximbank Chief Engineer, in Support of Defendant's Cross-Motion for Summary Judgment (Brois Affidavit), ¶ 4.

13. *Id.* ¶ 5.

14. *See* 162 U.S.App.D.C. at 228, 498 F.2d at 770.

15. *See* Statement of Points and Authorities in Opposition to Defendant's Cross-Motion for Summary Judgment at 8 & n.**.

16. In *National Parks II* the Court of Appeals decided that such detailed economic evidence was not necessary in the case before it, but refrained from speculating whether it might be

is not required where other sufficient evidence supports a finding of competition. The Court concludes that despite the existence of the OPEC cartel, the supplier of the information here does face competition in the production of oil as well as in other areas.[17]

It is next necessary to consider whether disclosure of the 1975 and 1976 progress reports will result in substantial harm to the competitive position of the supplier of the information. The progress reports contain information regarding costs, equipment deliveries, plant operation and scheduling, construction delays, cost-overruns, and contractual disputes.[18] Sonatrach argues that this information reveals its strengths and weaknesses as owner of the Skikda pipeline and that disclosure would affect its competitive position with its lenders, contractors, and purchasers.[19]

In *National Parks II* the Court of Appeals emphasized that disclosure of commercial and financial information would provide competitors with valuable insights into the operational strengths and weaknesses of the supplier of the information while the competitors could continue to "[play] their cards close to their chest." 178 U.S.App.D.C. at 387, 547 F.2d at 684. It also noted that "[s]uppliers, contractors, labor unions and creditors, too, could use such information to bargain for higher prices, wages or interest rates while . . . competitors would not be similarly exposed." *Id.* The affidavit of Sonatrach's Vice President for Engineering and Development details and explains how the information contained in the progress reports could be used to Sonatrach's detriment.[20]

In response plaintiff claims that the commercial and financial information contained

in two- and three-year old progress reports has become "stale" and thus will no longer produce any competitive injury through its release. The loan agreement, which is dated June 10, 1974, embodies continuing rights and responsibilities, including disbursement of funds through December 31, 1979 and repayment of funds until November 10, 1986.[21] Construction of the project described in the disputed reports is ongoing and is far from completion.

 Although plaintiff suggests that dramatic changes have occurred in recent years that have rendered obsolete the information contained in the progress reports, commercial and financial information of two or three years' vintage concerning an ongoing project can be a useful offensive tool in the hands of competitors. The Court recognizes that the competitive impact of commercial or financial information can be blunted by time, but concludes that this has not occurred in this case. Because disclosure of the 1975 and 1976 progress reports would produce substantial competitive harm to Sonatrach, the requirement of confidentiality is satisfied and the documents can be withheld under exemption (b)(4) to the FOIA.

## CONCLUSION

For the reasons discussed above, the Court holds that the loan agreement and the progress reports are confidential commercial or financial information and thus can be withheld under 5 U.S.C. § 552(b)(4).

necessary in other fourth exemption cases. 178 U.S.App.D.C. at 382, 547 F.2d at 679 n. 21.

17. *See* Affidavit of Otmane Khouani in Support of Motion for Leave to File Brief as Amicus Curiae (Khouani Affidavit), ¶¶ 9–11. For example, in the United States market, Algerian crude oil competes with oil from Canada, Mexico, England, Norway, and other countries. *Id.* ¶ 11.

18. Brois Affidavit, ¶ 4.

19. *See* Memorandum of Amicus Curiae Sonatrach in Support of Defendant's Cross-Motion for Summary Judgment, at 17–19.

20. Khouani Affidavit, ¶¶ 14–19.

21. *See* Exh. B to Defendant's Reply to Plaintiff's Opposition to Defendant's Cross-Motion for Summary Judgment.