Jerrold NADLER, Tribeca Community Association, and 67 Vestry Street Tenants Association, Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.

No. 94 Civ. 6579 (MBM).

United States District Court, S.D. New York.

Sept. 27, 1995.

Ronald Francis, Jeffrey D. Buss, Smith, Buss & Jacobs, New York City, for Plaintiffs.

Charlotte A. Reid, Senior Attorney Federal Deposit Insurance Corporation, Washington, DC, for Defendant.

MUKASEY, District Judge.

Plaintiffs Congressman Jerrold Nadler, the Tribeca Community Association, and the 67 Vestry Street Tenants Association have sued for declaratory and injunctive relief under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1994), seeking to compel defendant Federal Deposit Insurance Corporation ("FDIC") to disclose information withheld by the FDIC from its responses to plaintiffs' FOIA requests. Subject matter jurisdiction and venue are based on 5 U.S.C. § 552(a)(4)(B). Both parties have moved for summary judgment under Fed.R.Civ.P. 56. For the reasons set forth below, defendant's motion is granted, plaintiffs' cross-motion is denied, and the complaint is dismissed.

I.

The relevant facts are undisputed. The FDIC was appointed receiver for the failed American Savings Bank ("ASB") in June of 1992. (Compl. ¶ 8) At the time of ASB's failure, its asset portfolio included the wholly-owned subsidiary Amore Holdings, Inc. ("Amore"). (Compl. ¶ 9) Amore owns a parcel of land in lower Manhattan's Tribeca neighborhood that is the subject of a 1991 joint venture agreement (the "Agreement") entered into between Amore and Brewran West Associates ("Brewran"), the owner of an adjacent parcel of land. (Compl. ¶¶ 11, 13) Sixty-seven Vestry Street is the address of a neighboring apartment building. (Compl. ¶ 11) These properties are located within Nadler's Eighth Congressional District. (Compl. ¶ 11)

Plaintiffs submitted a total of three FOIA requests to the FDIC between October and December of 1993 seeking disclosure of various documents including the Agreement. (Compl. ¶¶ 18–19) Plaintiffs previously learned from records held by the City of New York that Amore and Brewran intend to combine their land and construct a 21-story hotel on the site. (Compl. ¶ 14) Plaintiffs, as well as some non-party community groups, fear that a hotel on the site would have an adverse impact on Tribeca's historic and architectural identity and would increase automobile traffic in the neighborhood and near the Holland Tunnel. (Compl. ¶ 16)

On March 24, 1994, the FDIC granted plaintiffs' FOIA requests in part and released a redacted copy of the Agreement. The deleted portions of the Agreement, the FDIC claimed, were not subject to disclosure because of 5 U.S.C. § 552(b)(4) ("Exemption Four"), which exempts from the requirements of the FOIA "trade secrets and commercial or financial information obtained from a person and privileged or confidential." (Compl. ¶¶ 20–22) Plaintiffs filed for administrative review under 5 U.S.C. § 552(a)(6)(A) in April and May of 1994. The FDIC issued final denials of plaintiffs' requests on May 12 and May 25, 1994, again on the authority of Exemption Four. (Compl. ¶¶ 31–32) Plaintiffs filed this action on September 12, 1994.

II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interroga-

tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Each party's motion here must be considered separately, with the evidence viewed in the light most favorable to the non-movant and "all justifiable inferences" drawn in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Here the essential facts are not disputed, so the case may be resolved as a matter of law; the decisive issue is the construction and application of Exemption Four.

The FOIA "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *Federal Bureau of Investigation v. Abramson,* 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982) (quoting *National Labor Relations Bd. v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978)). Several exceptions to the rule of mandatory disclosure—one of which is Exemption Four—are recognized within the statute, but these exceptions are construed narrowly. *Abramson,* 456 U.S. at 630, 102 S.Ct. at 2064. The court conducts a *de novo* review of the applicability of Exemption Four, which the FDIC must prove by a preponderance of the evidence. 5 U.S.C. § 552(a)(4)(B). The FDIC can meet this obligation with an affidavit specifying the factual basis for the exemption. *National Broadcasting Co. v. United States Small Business Admin.,* 836 F.Supp. 121, 124 n. 3 (S.D.N.Y.1993) (sworn declaration of company president justified FOIA exemption even though Court agreed with plaintiff that agency "should have provided more details regarding the likely harm").

Exemption Four properly may be invoked only if three conditions are met. First, the requested information must be a trade secret or "commercial or financial information." 5 U.S.C. § 552(b)(4). This issue is not in dispute. Plaintiffs do not contend that the redacted information is non-commercial and have not challenged the FDIC's assertion that the information *is* commercial. (*See* Chancy Aff. ¶ 17)

Second, the statute requires that the requested information be "obtained from a person." This issue also is not in dispute. "Person" is defined broadly in 5 U.S.C. § 551(2) to include "an individual, partnership, corporation, association, or public or private organization other than an agency." The FDIC obtained the Agreement from Amore, a corporation, when the FDIC became receiver for ASB in June of 1992. (*See* Chancy Aff. ¶¶ 2, 5)

Third, the requested information must be "privileged or confidential." 5 U.S.C. § 552(b)(4). This issue is at the center of the controversy.

### III.

#### A.

The Second Circuit follows the *National Parks* test first formulated by the D.C.Circuit to determine the applicability of Exemption Four. Under this test, agency-held information is deemed confidential within the meaning of Exemption Four if public disclosure of the information would "have the effect either (1) of impairing the government's ability to obtain information—necessary information—in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained." *Continental Stock Transfer and Trust Co. v. Securities and Exch. Comm'n,* 566 F.2d 373, 375 (2d Cir. 1977), citing *National Parks and Conservation Ass'n v. Morton,* 498 F.2d 765, 770 (D.C.Cir.1974). The two parts of the *National Parks* test serve two policies. The first part of the test accommodates the agency's own future interests; the second part of the test protects the current interests of third parties who deal with the agency. These policies are, of course, interrelated, because the protection of third parties' interests encourages cooperation with agencies.

Plaintiffs and defendant disagree as to the applicability and effect of the recent decision of the D.C.Circuit in *Critical Mass Energy Project v. Nuclear Regulatory*

*Comm'n,* 975 F.2d 871 (D.C.Cir.1992) (en banc), *superseding* 931 F.2d 939 (D.C.Cir. 1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993), which modified the *National Parks* test adopted by the Second Circuit in *Continental Stock. Critical Mass* limited the application of the *National Parks* test to "information a person was obliged to furnish the Government." *Critical Mass,* 975 F.2d at 880. Information provided on a *voluntary* basis, in contrast, is confidential under *Critical Mass* if "it is of a kind that the provider would not customarily release to the public." *Id.* The D.C.Circuit thus made it easier to prove confidentiality where information is volunteered to agencies and the decision thereby promoted voluntary disclosure.

Plaintiffs correctly point out that the Second Circuit has not commented on the *Critical Mass* modification of the *National Parks* test. Defendants correctly note that the *Critical Mass* decision was cited with approval in a footnote in a recent unreported case from this district. *Africa Fund v. Mosbacher,* No. 92 Civ. 289, 1993 WL 183736, at *7 n. 3 (S.D.N.Y. May 26, 1993). I need not decide whether *Critical Mass* is governing law in the Second Circuit, however, because Amore did not submit the Agreement to the FDIC voluntarily. Rather, the FDIC gained access to Amore's records by operation of law when it became receiver. Amore could not withhold the information because ASB obviously had access to the records of its wholly-owned subsidiary, and the FDIC as receiver acceded to the rights of ASB when that entity failed. *See* 12 U.S.C. § 1821(d)(2)(B)(i) (1994). Further, Amore has made it clear throughout that it "object[s] strenuously to the requested release." (Watt Aff. ¶¶ 11, 20) Since the Agreement was not produced voluntarily, the *Critical Mass* standard simply does not apply.

Thus, *National Parks* remains the relevant authority. But it is not clear which aspect of the two-part test, if either, provides the more appropriate framework for applying Exemption Four here. The FDIC invoked Exemption Four on behalf of both the agency's interest (in the success of the receivership program) and the interest of a private party, Amore (in the success of the joint venture). Under either theory, I believe the concept of confidentiality under Exemption Four permits the FDIC to withhold the redacted portions of the Agreement.

### B.

The first part of the *National Parks* test requires the FDIC to show that disclosure would impair the government's ability to obtain necessary information in the future. Plaintiffs argue, and the FDIC wisely concedes (*see* Def.Reply Mem. at 5 n. 7), that disclosure of the entire Agreement would not impair the FDIC's ability to obtain such information. In fact, no amount of disclosure could interfere with the FDIC's ability to gain information from businesses controlled by the FDIC as receiver. Receivership is involuntary, and once the FDIC assumes that role it enjoys the incidents of ownership over property previously held by the insolvent bank, including access to internal information. Because the FDIC gains this access automatically, disclosure here will not affect its ability to obtain information in the future.

But that is not the end of the inquiry. The Court in *National Parks* explicitly reserved judgment "as to whether other governmental interests are embodied in this exemption." 498 F.2d at 770 n. 17. *See also Critical Mass,* 975 F.2d at 879. Thus, *National Parks* did not hold definitively that the agency's ability to obtain information in the future was the only agency interest cognizable under Exemption Four. By way of example, the Court suggested "program effectiveness" as a governmental interest "possibly served by this exemption." 498 F.2d at 770 n. 17 (citing *Hearings on S. 1666 Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary,* 88th Cong., 1st Sess. 200 (1964)).

Diverse agency interests have been recognized by other courts. For example, in *Comstock Int'l (U.S.A.), Inc. v. Export–Import Bank of the United States,* 464 F.Supp. 804 (D.D.C.1979), a FOIA requester sought to compel the defendant agency to disclose documents pertaining to loans the agency had made to an Algerian oil and gas development company. Under these circumstances, there

was no risk of impairing the agency's ability to obtain information of this sort in the future because as the lender, the agency would have direct access to loan-related documents. Nevertheless, the Court held that Exemption Four was available because disclosure would impair the agency's ability to execute its statutory mandate. Commercial banks and borrowers were reluctant to negotiate loan agreements with the agency absent assurances of confidentiality, and the Court found that this reluctance would interfere with the agency's ability to promote United States exports. *Id.* at 808.

The First Circuit took a similar view of Exemption Four in *9 to 5 Organization for Women Office Workers v. Board of Governors of the Fed. Reserve Sys.*, 721 F.2d 1 (1st Cir.1983). The defendant agency in that case was a member of a private organization that compiled information on employee salaries at Boston-area financial institutions. The information was collected from surveys completed by the member organizations, and summary data then was redistributed to the members. Membership was conditioned on keeping the information confidential, and the agency needed the information in order to maintain competitive levels of compensation that would attract qualified employee candidates. The agency refused to disclose the salary information to a FOIA requester for fear of being expelled from the organization, but the District Court found Exemption Four inapplicable because the information was not literally "necessary" to the agency's mission.

The First Circuit reversed and remanded, holding that Exemption Four protected not only information absolutely necessary to an agency, but also "information which would be particularly helpful to agency officials in carrying out their mandate." *Id.* at 10. The Court stressed that "the Government should not be precluded from invoking the protection of exemption 4 merely because the asserted interest is not precisely one of those two identified in *National Parks* [ ]." *Id.* at 9–10. The agency's interest in "effective personnel policies and salary structures," the Court held, might satisfy Exemption Four. *See also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 830 F.2d 278,

286 (D.C.Cir.1987) (NRC may be entitled to withhold nuclear safety reports obtained from private utility industry organization), *rev'd on other grounds*, 975 F.2d 871 (D.C.Cir.1992) (en banc); *Africa Fund*, 1993 WL 183736, at *5 (citing *9 to 5* with approval in holding that U.S. Commerce Department was entitled to withhold documents relating to export license applications under Exemption Four).

There is of course the danger that a formulation as loose as "program effectiveness" might cause the confidentiality exemption to devour the rule of broad disclosure. However, so long as courts do not allow agencies' ritual and unsubstantiated incantations of "program effectiveness" to suffice as justification for non-disclosure, that broad threat to disclosure can be avoided. Agencies instead must identify specific dangers that disclosure will pose to the fulfillment of their statutory responsibilities. And the burden of persuasion rests, as always, on the agency.

In any event, it is not necessary to decide whether to recognize a generic government interest in program effectiveness under Exemption Four. It is enough to hold only that the peril to the FDIC's mission here as receiver is sufficiently compelling to merit use of the exemption. Ordering disclosure here would interfere significantly with the FDIC's receivership program, which aims to maximize profits on the assets acquired from failed banks. The profits the FDIC will realize on Amore will depend in large part on the success of the Amore–Brewran joint venture that is the subject of the Agreement. Disclosure of sensitive business plans can only hurt the venture's prospects for financial success and, in turn, reduce returns to the FDIC. The inability to keep business secrets secret would be a serious handicap to any enterprise, and Amore's status as a receivership asset does not change the calculus.

Moreover, the FDIC has demonstrated that the business it controls through the receivership faces not only competition within the real estate market, but also concerted opposition from groups seeking to prevent the joint venture from succeeding. The joint venturers have sworn, and the court agrees, that "[d]elays in the approval process are

costing Amore Holdings, Inc. money and lost time," (Watt Aff. ¶ 19), and that "[d]enial of future necessary approvals would result in even greater financial hardship and commercial disadvantage." (Sloss Aff. ¶ 17). To hold that Exemption Four is unavailable to the FDIC here would set a bad precedent: the FDIC's entire portfolio of receivership assets would be open to invasive inquiries and financially damaging disclosures.

### C.

Under the second part of the *National Parks* test, confidentiality may be established under Exemption Four if disclosure of the relevant information would have the effect of "causing substantial harm to the competitive position of the person from whom the information was obtained." *Continental Stock,* 566 F.2d at 375. The FDIC argues that the joint venturers will suffer substantial competitive harm if the redacted passages of the Agreement are released to plaintiffs. Plaintiffs respond that the provider of the information cannot suffer competitive harm here because ASB is defunct, and because any harm would be inflicted by community groups who are not competitors of the joint venturers in the New York City real estate market. (*See* Pl.Mem. at 14–15)

The argument that there is no harm to "the person from whom the information is obtained" because ASB is defunct mistakes the nature of receivership and is formalistic. Plaintiffs in effect ask this court to hold that all preexisting rights of the bank were destroyed because a corporate reorganization occurred. But as receiver, the FDIC acceded to the rights of the failed financial institution. *See* 12 U.S.C. § 1821(d)(2)(A)–(B). Moreover, the objections to the release of the information have been raised and maintained by the managers of an existing entity, Amore Holdings, Inc. (*See* Watt Aff. ¶ 11)

Plaintiffs are correct insofar as they note that the opponents of the joint venture project do not compete with the joint venturers as rival New York City real estate developers. But the economic injury they may inflict on the joint venture is nonetheless a competitive injury. Plaintiffs' avowed goal is to drive the joint venture out of business.

Any financial loss by the joint venture will jeopardize both the venture's relative position vis-a-vis other New York City real estate developers and its solvency. Plaintiffs' argument recalls the antitrust refrain that antitrust law protects competition, not competitors. This argument is misplaced when applied to Exemption Four because the exemption is in fact designed to protect competitors who submit information to agencies.

Thus, the FDIC has demonstrated convincingly the existence of substantial competitive harm. The more difficult question is whether "the person from whom the information was obtained" here is within the class of persons protected by the second part of the *National Parks* test. Nominally, the person who provided the information and who stands to suffer harm is Amore. However, in one sense the provider and sufferer of harm is the FDIC itself because Amore is under the control of the agency. The FDIC is invoking the "substantial harm" prong of the *National Parks* test ultimately to protect *its own* interest—the maximization of the value of a receivership asset. Yet the second part of the *National Parks* test seems to have been formulated with the interests of private sector third parties in mind.

But even if the literal language of the second part of the *National Parks* test embraces only private third parties and not the agency itself, the FDIC is not precluded from relying on Exemption Four for at least two reasons. First, as noted above, the FDIC assumes as receiver a separate legal existence. Unlike the FDIC qua agency, the FDIC in *its* role as receiver may assert the rights of private parties. *Cf. O'Melveny & Myers v. Federal Deposit Ins. Corp.,* —— U.S. ——, ——, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994) (the FDIC as receiver "steps into the shoes" of the failed institution and acquires "the rights that existed prior to the receivership"). Second, the *National Parks* test does not mark the outer limits of Exemption Four. The FDIC's mission as receiver should be recognized as a legitimate government interest cognizable under Exemption Four even if the *National Parks* test is not read to include the present situation.

Permitting the FDIC to rely on Exemption Four in aid of its receivership mission will not seriously compromise the policies served by FOIA. The thrust of the FOIA is to create a right of access to official information. Information generally acquires an "official" character either when it is generated by the agency itself or is acquired from private parties whose activities are substantively germane to the agency's "official" mission. Here, the real estate development plans of the joint venture have nothing to do with the FDIC's regulation of the deposit insurance system in this country. The agency's mission as receiver is not to deal in commercial real estate. Rather, it is to obtain the maximum possible proceeds when it disposes of assets. Disclosure here would not enlighten the public as to how the government in its sovereign capacity regulates deposit insurance, but would only frustrate the FDIC's goal of keeping the deposit insurance coffers as full as possible.

Further, this conclusion does no violence to the literal language of the statute, which exempts "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Here, the redacted information is commercial in nature; it was obtained from a person, Amore; and it is confidential in the ordinary sense of the word. Any awkwardness in the application of Exemption Four is attributable only to language in a judicial interpretation of the statute that was formulated with different facts in mind.

### IV.

Because the FDIC is entitled to withhold the redacted information under Exemption Four, there is no need to reach the issue of whether disclosure of this information also would violate the Trade Secrets Act, 18 U.S.C. § 1905, which imposes criminal penalties on persons who disclose certain government secrets. See 9 to 5, 721 F.2d at 12 ("If the documents are found to be exempt from disclosure under the FOIA, they will not be disclosed and no question will arise under section 1905").

Plaintiffs also have petitioned the court to exercise its discretion under the FOIA to examine the withheld information in camera to determine if an exemption properly may be invoked. See 5 U.S.C. § 552(a)(4)(B). I decline this invitation. The commercial nature of the withheld information has not been challenged, and no purpose would be served by such an examination.

### V.

Because the redacted information is confidential within the meaning of Exemption Four, the FDIC was entitled to withhold it from plaintiffs. Therefore, defendant's motion for summary judgment is granted and plaintiffs' cross-motion for summary judgment is denied. The complaint is dismissed.

SO ORDERED: