**9TO5 ORGANIZATION FOR WOMEN OFFICE WORKERS, Plaintiff,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Defendant.**

**Civ. A. No. 80–2905–C.**

United States District Court, D. Massachusetts.

Sept. 30, 1982.

John Reinstein, Massachusetts Civil Liberties Union Foundation, Boston, Mass., for plaintiff.

Tretter McGovern, Asst. U. S. Atty., Stephen L. Siciliano, Senior Counsel, Bd. of Governors of the Federal Reserve System, Washington, D.C., for defendant.

## MEMORANDUM

CAFFREY, Chief Judge.

On June 17, 1982, the defendant in this Freedom of Information Act ("FOIA") case, the Board of Governors of the Federal Reserve System ("The Board"), was ordered to revise the "Vaughn Index" * it had earlier submitted to substantiate its claim that 350-odd documents sought by the plaintiff 9to5 Organization of Women Office Workers ("9to5") under the FOIA were exempt from the FOIA's general rule of disclosure of all documents held by the government. The Court ruled at that time that the Index which originally was submitted did little to aid the Court in determining whether virtually all of the documents in question were exempt from disclosure under 5 U.S.C. § 552(b)(5) as claimed by the Board due to their being "inter-agency memoranda or letters which would not be available by law to a party ... in litigation with the [governmental] agency" involved. Because the original Index was largely in chronological and contextual disarray, I found that it served more to confuse the issue at hand than to help the Court resolve it.

An examination of the radically amended Index—rearranged in compliance with the terms of the Court's June 17, 1982 memorandum and order—reveals that few, if any, of this large number of documents are exempt under § 552(b)(5).

As has been noted for these parties in two separate memoranda on this issue, Exemption 5 of the FOIA has been interpreted to exempt "materials reflecting the deliberative or policy making process" from the FOIA's general policy of disclosure of all information held by government agencies. The goal of this exemption is that of encouraging the frank and candid intra-governmental discourse necessary for the development of sound public policy. *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87–89, 93 S.Ct. 827, 836–837, 35 L.Ed.2d 119 (1973). However, "purely factual, investigative matters," which are "severable [from documents otherwise exempt under § 552(b)(5)] without compromising the private remainder of the documents," *Id.* at 91, 93 S.Ct. at 838, must be disclosed, for disclosure of these materials poses no threat to the deliberative process. Case law has also established that in order for Exemption 5 to apply, the material must clearly be "pre-decisional," *N.L.R.B. v. Sears-Roebuck & Co.,* 421 U.S. 132, 151, 95 S.Ct. 1504, 1517, 44 L.Ed.2d 29 (1975), and that deliberative materials such as recommendations which are *"expressly"* adopted by decisionmakers and thus become agency policy lose their Exemption 5 status, and must be disclosed. *Id.* at 161, 95 S.Ct. at 1521 (emphasis in the original). The Supreme Court has articulated the rationale which underlies this policy as follows:

> The probability that an agency employee will be inhibited from freely advising a decisionmaker for fear that his advice, *if adopted,* will become public is slight. First, when adopted, the reasoning becomes that of the agency and becomes *its* responsibility to defend. Second, agency employees will generally be encouraged rather than discouraged by public knowledge that their policy suggestions have been adopted by the agency. Moreover, the public interest in knowing the reasons for a policy actually adopted by an agen-

---

* See *Vaughn v. Rosen,* 523 F.2d 1136 (D.C.Cir. 1975).

cy supports [the policy of denying exemption 5 status to "adopted" memoranda]. . . .

*Id.* at 161, 95 S.Ct. at 1521. *See also Aug v. National Railroad Passenger Association,* 425 F.Supp. 946, 950 (D.D.C.1976).

The revised Vaughn Index separates the documents in question into four general categories, in compliance with the Court's June 17, 1982 memorandum and order. The first category ("Group I") consists of letters, typically from a senior officer of the Federal Reserve Bank of Boston ("The Bank") to the Board, requesting that the Board approve a change in the Bank's salary structure. Multipage Bank reports which spell out and explain the reasons underlying the proposed changes appear to have been attached to these letters. These reports were often listed in the original Index separately from their cover letters. *See, e.g.,* original Index Items # 115, # 111, # 118. The Board was ordered to link these reports in the revised Index to the letters which originally accompanied them.

The second group ("Group II") consists of memoranda prepared for the Board, usually by the Board's Division of Personnel, in which the Bank's requests for approval of proposed salary changes are examined in detail. *See, e.g.* original Index Item # 114. The Board was ordered to link each of these Group II documents in the revised Index with the relevant Group I documents.

Group III consists of letters from the Board to the Bank announcing the Board's decisions with respect to the Bank's proposed salary changes. The Board was ordered to link each of these Group III documents in the revised Index with the relevant Group I and II documents.

The last group of documents ("Group IV") consists of extensive reports compiled by the Bank as part of its efforts to maintain a compensation structure which was competitive with private-sector businesses in the Boston area; these reports apparently were used by the Bank in formulating the proposed changes in its salary structure which were submitted to the Board for approval. While the original Index did not indicate how these reports come into the Board's possession, it was obvious that the reports had probably been attached to the Group I letters. The Board was accordingly ordered to link each Group IV report that it had reason to know had originally been submitted as an attachment to a Group I letter with that letter. The Court also ruled that each Group IV report that could be linked with a Group I letter would be considered as a part of that letter, along with the other materials that had been submitted with that letter.

In the Court's July 17, 1982 memorandum, the theory used by the Board to support its contention that the documents of Groups I and III were within Exemption 5 was summarized as follows:

The Board has used a curious and circular form of argument to support its invocation of Exemption 5 for the materials which fall within the first and third groups. The letters and attached materials of the first group are within Exemption 5, according to the Board, because they are the type of 'predecisional', 'advisory' material that the courts have found is covered by this exemption. The Board does not argue that the letters of the third group (which convey the Board's decisions on the Bank's proposed salary changes which were conveyed to the Board through the letters and attached materials of the first group) are predecisional or advisory. Rather, the Board claims that these letters are exempt under Exemption 5 because they make reference to the letters of the first group sent to the Board by the Bank, and that those references cannot be reasonably deleted from the material. Our *in camera* inspection [of documents selected from the original Index] shows, however, that these letters from the Board to the Bank typically *adopt* the recommendation proposed by the Bank, and thereby strip these materials of their Exemption 5 status. Since these letters and attached materials of the first group are not within Exemption 5 whenever the advice and recommendation contained in them has

been adopted by the Board (as announced in the group-three letters to the Bank from the Board), they cannot be used to bootstrap the Group three letters of the Board—which undeniably constitute 'final decisions'—into Exemption 5. Thus, when the Bank recommendations have been adopted by the Board, the letters and attached materials of the first and third groups lose their Exemption 5 status.

The Court accordingly ruled that whenever a Group III letter from the Board to the bank explicitly adopted a Group I Bank proposal, "none of this material will be deemed to be within Exemption 5 of § 552(b), and the Board is not to invoke this Exemption with respect to this material." Memorandum, June 17, 1982, at 7.

■ In not a single summary of the Group III letters listed within the Board's revised Index, however, does the Board give any indication of whether the withheld letter adopts in whole or in part the corresponding proposal submitted by the Bank by way of a Group I letter. Even assuming that none of the Group III letters adopts the proposal of a Group I letter, much of Group I material which the Board claims is within Exemption 5 because of its predecisional and advisory nature appears, based on the Board's own summary of the documents in the revised Index, to be purely factual information, which in any event is not within the scope of Exemption 5. *See, e.g.,* Revised Index Items # 5b, # 5c, # 5n, # 10b, # 10h, # 10i, and # 10o.

■ Despite the Board's continued failure to state in its summaries of the Group III letters whether the Board in those letters adopted the Bank's proposals made by way of the Group I materials, there is ample evidence for the Court to find, as I do, that these proposals were routinely adopted by the Board. An examination of the documents from the years 1965, 1970, 1975, and 1980—which the Court ordered the Board to submit to it for *in camera* inspection—satisfies me that for each of the twenty-five or so years in question, the Board, after considering a regularly executed review of the

Bank's proposals by the Board's staff, routinely adopted in whole the Bank's proposal, thereby stripping the Group I and III materials of whatever Exemption 5 status they may have enjoyed. For the years 1965, 1970, and 1975, the documents examined by the Court show that the Bank's proposals were accepted *in toto* by the Board. Since the Board has supplied no evidence that the Bank's proposals were not similarly adopted by the Board during the other years, there is no reason to give the Board the benefit of the doubt on this issue.

The documents from the year 1980 include no Group III letter from the Board to the bank concerning the Bank's proposed salary structure changes for that year. Similarly, the revised Index does not include a summary of a Group III letter for the year 1979. This situation is explained by the fact that sometime in early 1979, the responsibility for approving changes in the Bank's salary structure was delegated from the Board to the Bank. Thus, the so-called Group I proposals of the Bank for 1979 and 1980—which the Board argues are within Exemption 5 because of their "pre-decisional" and "advisory" nature—are not proposals at all, but rather are decisions, which in no manner can enjoy Exemption 5 protection.

Examination of the revised Index and the documents submitted for *in camera* inspection have satisfied me, and I rule, that none of the Exemption 5 claims made by the Board with respect to Group I and Group III materials (including the appropriate Group IV reports) is warranted.

As was noted in the Court's July 17, 1982 memorandum, the Group II materials—which consist of analyses of the Bank's proposals made by the Board's own staff—are exempt from disclosure under Exemption 5 if they have not been explicitly adopted by the Board. Since neither the revised Index nor the documents presented for *in camera* inspection show that any of the Group II materials were ever explicitly adopted by the Board, I rule that these materials are within Exemption 5, and thus may be disclosed at the discretion of the Board.