721 F.2d 1
 9 TO 5 ORGANIZATION FOR WOMEN OFFICE WORKERS, Plaintiff, Appellee,
v.
The BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM,
Defendant, Appellant.
 No. 83-1171.
 United States Court of Appeals,
First Circuit.
 Argued May 4, 1983.
Decided Nov. 2, 1983.
 
 Peter R. Maier, Appellate Staff, Civ. Div., Dept. of Justice, with whom J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., William F. Weld, U.S. Atty., Joseph J. McGovern, Asst. U.S. Atty., Boston, Mass., Leonard Schaitman, Appellate Staff, Civ. Div., Dept. of Justice, Michael Bradfield, Gen. Counsel, and Stephen L. Siciliano, Senior Counsel, Washington, D.C., were on brief, for defendant, appellant.
 Robert E. Williams, Douglas S. McDowell, Lorence L. Kessler, and McGuiness & Williams, Washington, D.C., on brief, for Equal Employment Advisory Council, amicus curiae.
 John Reinstein, Boston, Mass., with whom Marjorie Heins, Boston, Mass., was on brief, for plaintiff, appellee.
 Cornish F. Hitchcock, and David C. Vladeck, Washington, D.C., on brief, for the Freedom of Information Clearinghouse, amicus curiae.
 Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and RE,* Chief Judge.
 RE, Chief Judge.
 
 
 1
 In this action, brought under the Freedom of Information Act, 5 U.S.C. Sec. 552 (1976), the Board of Governors of the Federal Reserve System appeals from a decision of the District Court for the District of Massachusetts ordering the Board to disclose to the 9 to 5 Organization for Women Office Workers documents containing salary survey data obtained from the Boston Salary Survey Group, a private organization. The Board contends that the documents, which consist primarily of salary-related correspondence between the Board and the Federal Reserve Bank of Boston, are exempt from disclosure under exemption 4 of the FOIA because they contain "commercial or financial information obtained from a person and ... confidential." 5 U.S.C. Sec. 552(b)(4).
 
 
 2
 The district court, relying on National Parks and Conservation Ass'n v. Morton, 498 F.2d 765 (D.C.Cir.1974), aff'd in part and rev'd in part sub nom. National Parks and Conservation Ass'n v. Kleppe, 547 F.2d 673 (D.C.Cir.1976), held that the documents are not "confidential" within the meaning of section 552(b)(4) because their disclosure "will not impair the government's ability to obtain necessary information in the future." 551 F.Supp. 1006, 1010 (D.Mass.1982) (emphasis in original). Because we find that the Boston Salary Survey Group salary data may be sufficiently "necessary" to merit confidential treatment, we vacate the judgment of the district court and remand this action so that the district court may determine, in light of this opinion, whether the requested information is confidential within the meaning of FOIA exemption 4.
 
 The Facts
 
 3
 The Board of Governors of the Federal Reserve System (the Board) is an agency of the United States Government. By statute, it is required to supervise the operations of the twelve congressionally chartered federal reserve banks. 12 U.S.C. Sec. 248(j) (1976). Included among the Board's supervisory responsibilities is the duty to review and approve the salaries paid to employees of the federal reserve banks. 12 U.S.C. Sec. 307 (1976).
 
 
 4
 The Board has determined that, in order to attract, retain and motivate qualified employees, the federal reserve banks should maintain levels of compensation which are competitive with those offered by other employees in the relevant labor market. Toward this end, the Board requires that the regional reserve banks base their salary proposals on timely surveys of pay rates, benefits and other elements of compensation offered by competitive employers. The Board directs the reserve banks to participate, when possible, in broadly-based community salary surveys.
 
 
 5
 Since 1956, the Federal Reserve Bank of Boston (the Bank) has been a member of the Boston Salary Survey Group (BSSG), a private organization composed of approximately 40 of the Boston area's largest employers. On a periodic basis, BSSG compiles salary and wage data obtained from each of its members and distributes the results of the survey to each member of the group. Before the survey is distributed to the members of BSSG, the data is encoded to prevent the identification of individual employers. The members of BSSG have explicitly agreed to treat the salary information contained in the surveys as confidential, and to refrain from making the information available to the public. Members who violate this pledge of confidentiality are subject to expulsion from the group.
 
 
 6
 On September 29, 1980, the Secretary of the Board of Governors received an FOIA request from the 9 to 5 Organization for Women Office Workers (9 to 5). 9 to 5 sought access to all documents in the possession of the Board relating to: 1) BSSG surveys; 2) the Federal Reserve Bank of Boston's use of BSSG surveys; 3) BSSG membership lists and criteria; 4) use of BSSG surveys by member companies; 5) salary adjustments made by the Bank since 1956; and 6) correspondence within the Federal Reserve System involving BSSG salary surveys.
 
 
 7
 Relying on exemptions 2, 4 and 5 of the FOIA, 5 U.S.C. Sec. 552(b)(2), (4), (5), the Secretary declined to release any of the documents requested by 9 to 5. 9 to 5 appealed the denial of its request to the Board of Governors, which also declined to release the requested documents.
 
 Proceedings in the District Court
 
 8
 After the denial of its administrative appeal, 9 to 5 filed in the District Court for the District of Massachusetts a suit to compel disclosure of the requested documents. The Board identified more than 350 documents which it thought were responsive to 9 to 5's request. Among these documents were annual reserve bank reports containing BSSG salary information; correspondence between the Board and the Bank concerning salary recommendations; and internal Board memoranda in which the Board's staff analyzed the Bank's salary proposals. The Board maintained that each of the documents was exempt from the FOIA's general mandate of disclosure under at least one, and sometimes more than one, of four exemptions specified in 5 U.S.C. Sec. 552(b), which provides in pertinent part:
 
 
 9
 (b) This section does not apply to matters that are--
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 (2) related solely to internal personnel rules and practices of an agency;
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
 
 
 16
 (5) inter-agency or intra-agency memoranda or letters which would not be available by law to a party other than an agency in litigation with the agency;
 
 
 17
 (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
 
 
 18
 * * *
 
 
 19
 * * *The Board also claimed that disclosure of some of the documents would violate the Trade Secrets Act, 18 U.S.C. Sec. 1905 (Supp. IV 1980), which makes it a criminal offense for employees of the government to disclose trade secrets and other confidential business information obtained from private sources unless the disclosure is authorized by law.
 
 
 20
 Both parties filed motions for summary judgment, and the district court, in a series of memorandum opinions and orders, ruled as follows. See 9 to 5 Organization for Women Office Workers v. Board of Governors of the Federal Reserve System, 527 F.Supp. 1163 (D.Mass.1981); Id., 547 F.Supp. 846 (D.Mass.1982); Id., 551 F.Supp. 1006 (D.Mass.1982).
 
 
 21
 In an opinion issued on December 21, 1981, the district court rejected the Board's contention that disclosure of some documents would violate the Trade Secrets Act. 527 F.Supp. 1163, 1166-67 (D.Mass.1981). The court held that, since the FOIA authorized disclosure of all information held by government agencies, "[o]nly the disclosure of information which fits into one of the nine exemptions of [section] 552(b) may constitute unauthorized disclosure and thus may activate the provisions of the Trade Secrets Act." 527 F.Supp. at 1167. Consequently, the district court held that invocation of the Trade Secrets Act provided no additional justification for withholding the requested documents.
 
 
 22
 Since 9 to 5 did not oppose the Board's contention that some of the documents were exempt from disclosure under exemptions 2 and 6 of the FOIA, the district court granted the Board's motion for summary judgment as to those documents. 527 F.Supp. at 1167.
 
 
 23
 Finding that a genuine issue of fact existed as to the Board's exemption 4 claim, the court deferred its consideration of that issue. At the same time the court ordered the Board to submit some of the remaining documents for an in camera inspection to determine whether they could properly be withheld under exemption 5.
 
 
 24
 Following the in camera inspection, and after the Board had complied with an order requiring it to submit a revised Vaughn index,[1] describing the remaining documents and correlating each of them with the statutory provision under which it was claimed to be exempt, the district court issued a second opinion on September 30, 1982. 547 F.Supp. 846 (D.Mass.1982). In that opinion, the district court addressed the Board's contention that the requested documents could be withheld under FOIA exemption 5, 5 U.S.C. Sec. 552(b)(5), which allows agencies to withhold inter-agency or intra-agency memoranda, which would not be available by law to a party other than an agency in litigation with the agency. The court ruled that the internal Board memoranda, in which the Bank's salary proposals were analyzed by the Board's staff, were intra-agency memoranda containing recommendations and advice which had not been explicitly adopted as the policy of the Board. These internal memoranda, therefore, were held to be exempt from disclosure under exemption 5 of the FOIA.
 
 
 25
 As to the remaining documents, however, the court held that exemption 5 was inapplicable. The court found that the remaining documents consisted of letters from the Bank to the Board, requesting approval of changes in the Bank's salary structure; letters from the Board to the Bank announcing the Board's decisions as to the Bank's salary proposals; and salary reports compiled by the Bank and submitted to the Board in support of the Bank's salary proposals. Since the Bank's salary proposals were routinely adopted by the Board, and thus became the policy of the Board, the court held that the documents did not fall within the ambit of exemption 5, which is intended to protect only pre-decisional, deliberative materials. See N.L.R.B. v. Sears-Roebuck & Co., 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975); Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).
 
 
 26
 After the district court's first two opinions, the sole issue left to be decided was whether the same documents which had been denied exemption 5 status, were protected from disclosure under FOIA exemption 4, which allows agencies to withhold commercial or financial information that was obtained from a person and is privileged or confidential. Before the district court ruled on this issue, it was informed that, as a result of an investigation into the Group's survey practices, the Boston Salary Survey Group and the Attorney General of the Commonwealth of Massachusetts had entered into a consent decree. Under the terms of the decree, BSSG agreed that future salary surveys would be randomly encoded, would contain only aggregate data, would not include any job category having fewer than 10 incumbents, and would not include an industry-by-industry analysis of the data. BSSG also agreed to disclose upon reasonable request the identity of its members, and to permit group members, if they so wished, to disclose to an employee the aggregate weighted average salary data for the pertinent job category.
 
 
 27
 On December 2, 1982, the district court issued its decision as to the Board's exemption 4 claim. 551 F.Supp. 1006 (D.Mass.1982). The court noted that under that provision information is exempt from disclosure if it is 1) commercial or financial in nature, 2) obtained from a person, and 3) confidential. Having determined in its first memorandum opinion that the requested information was commercial or financial in nature, and had been obtained from a person, the court focused on the issue of confidentiality.
 
 
 28
 The district court stated, and in the district court the parties agreed, that the standard for determining whether information is confidential under exemption 4 was enunciated in National Parks and Conservation Ass'n v. Morton, 498 F.2d 765 (D.C.Cir.1974) (National Parks I), aff'd in part and rev'd in part sub nom. National Parks and Conservation Ass'n v. Kleppe, 547 F.2d 673 (D.C.Cir.1976) (National Parks II ). According to National Parks I :
 
 
 29
 [C]ommercial or financial matter is "confidential" for purposes of [exemption 4] if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future;[17] or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.
 
 
 30
 498 F.2d at 770 (footnote 17 omitted).
 
 
 31
 Before the district court, the Board relied exclusively on the first part of the National Parks I test. It contended that the government's ability to obtain necessary information would be impaired because disclosure of the requested documents would lead inevitably to the Board's expulsion from the Boston survey group, and thus deprive the Bank of information needed to keep the salaries of Bank employees competitive.
 
 
 32
 In applying National Parks I to the facts of this case, the district court observed that the first part of the test was itself a two-part test. According to the district court, in order for the Board to prevail it had to establish "first, that disclosure is likely to impair the Government's ability to obtain such information in the future, and secondly, that the information is 'necessary.' " 551 F.Supp. at 1008 (emphasis in original).
 
 
 33
 After ruling that a genuine issue of fact still existed as to the likelihood that disclosure would impair the Government's ability to obtain information in the future, the district court granted 9 to 5's motion for summary judgment based on the court's determination that the survey data was not "necessary" information. In so ruling the court said that "an inspection of the legislative history reveals that one of the major Congressional goals was to safeguard information given to an agency in its official capacity." (emphasis in original) (citations omitted). Here, however, the court felt that the Board obtained the information merely in a commercial capacity. The legislative history, the court concluded, does not "reflect any particular Congressional desire that an exemption to the FOIA be created to protect information gained by an agency through commercial relationships established with non-governmental business entities."
 
 
 34
 The court noted that 8 of 12 Federal Reserve Banks establish salary levels without participating in private salary survey groups, and that the Federal Reserve Bank of Boston itself utilized other sources of wage information. This evidence, it concluded, showed usefulness but not necessity:
 
 
 35
 The information provided to the Federal Reserve Bank by the BSG undoubtedly facilitates the establishment of a competitive compensation structure; however, the information is not "necessary," within the meaning of exemption 4, to the Federal Reserve Bank's role in the Government. The salary data is not of such importance to the Government, or more importantly, to the governing process, that it should be exempt from the general policy of disclosure embodied in the [FOIA].
 
 
 36
 551 F.Supp. at 1010. Thus, the district court found that the salary survey information was not confidential within the meaning of exemption 4 because it was not "necessary" to the Reserve Bank's role in the federal government.
 
 
 37
 The Board has appealed the decision of the district court that the requested documents are not confidential within the meaning of FOIA exemption 4. Although in the district court the Board relied on National Parks I in attempting to bring the requested documents within the ambit of exemption 4, on this appeal the Board urges us to reject the reasoning of National Parks I. Instead, the Board urges us to hold that information is confidential under exemption 4 if "it is commercial or financial information that (1) the submitter expects to be treated confidentially, and (2) is of a type that is entitled to a reasonable expect[at]ion of confidentiality by the submitter." Alternatively, the Board contends that even under National Parks I, the decision of the district court should be reversed.
 
 
 38
 In addition, the Equal Employment Advisory Council, which has filed an amicus brief, contends that the district court erred in summarily rejecting the Board's contention that disclosure of the requested documents would violate the Trade Secrets Act.
 
 
 39
 9 to 5 and amicus curiae, the Freedom of Information Clearinghouse, have filed briefs urging that we affirm the decision of the district court. At the outset, 9 to 5 contends that we should dismiss without consideration the Board's attack on National Parks I because that issue was not raised in the district court. Should we consider the precedential impact of National Parks I, 9 to 5 urges that we approve its reasoning. However, 9 to 5 also contends that, under either National Parks I or the more permissive standard proposed by the Board, the requested documents should not be treated as confidential because the Board has not made a factual showing sufficient to support a finding of confidentiality.[2]
 
 FOIA Exemption 4
 
 40
 The nature of the information that is "confidential" within the meaning of exemption 4 has troubled the courts since the enactment of the FOIA. At least part of the confusion surrounding exemption 4 must be attributed to what has been described as "the tortured, not to say obfuscating, legislative history of the FOIA...." American Airlines, Inc. v. Nat'l Mediation Board, 588 F.2d 863, 865 (2d Cir.1978). Most important as to the present case is that, with reference to exemption 4, both the House and Senate reports speak of information which is customarily regarded as confidential. H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10 (1966), reprinted in 1966 U.S.Code Cong. & Ad.News 2418, 2427; S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965). Yet, neither of the reports which accompanied the Act explains why an earlier version of exemption 4, which would have exempted "trade secrets and other information obtained from the public and customarily privileged or confidential," was amended to delete the word "customarily" and add the words "commercial or financial," bringing the provision to its enacted form. See National Parks I, 498 F.2d at 769; K. Davis, Administrative Law Treatise Sec. 3A.10 (Supp.1970).
 
 
 41
 The attempt to analyze the FOIA's legislative history is complicated further by the fact that the 1966 House Report has been discredited as an aid to interpreting the Act because it was submitted after the Senate had made its report and passed the bill. The House then passed the bill without amendment, thereby depriving the Senate of the opportunity to object or concur in the interpretation of the Act written into the House Report. See Dep't of the Air Force v. Rose, 425 U.S. 352, 365-67, 96 S.Ct. 1592, 1601-02, 48 L.Ed.2d 11 (1976); K. Davis, Administrative Law Treatise Sec. 5.3 (2d ed. 1978).
 
 
 42
 Despite the shortcomings of the FOIA's legislative history, it has nonetheless been relied upon by the courts which have had to interpret exemption 4. A 1978 Report of the House Committee on Government Operations collected and analyzed the various approaches taken by the courts which have interpreted and applied exemption 4 of the FOIA. H.R.Rep. No. 95-1382, 95th Cong., 2d Sess. 16-21 (1978). Early cases which applied exemption 4 utilized a "promise of confidentiality test" which exempted from disclosure any commercial or financial information that was revealed to the government under an express or implied promise by the Government to keep the information confidential. The promise of confidentiality test was soon abandoned, however, because it established no standards for determining when the Government could properly extend a promise of confidentiality. Neither was it useful to determine whether to release information that was arguably confidential, but which had been obtained without a Government promise of confidentiality. Id. at 16-17.
 
 
 43
 The promise of confidentiality test was succeeded by the "expectation of confidentiality test." Under that test, commercial or financial information was regarded as confidential if it was of a type that customarily would not be released to the public by the person from whom it was obtained. The expectation of confidentiality test was criticized and ultimately rejected because it placed too much emphasis on the intent of the submitter, making the Government's disclosure policy contingent on the disclosure policy of the individual submitter. Id. at 17-18.
 
 
 44
 The expectation of confidentiality test was followed by the two-prong test announced in National Parks I. In National Parks I, the Court of Appeals for the District of Columbia Circuit addressed the question whether information contained in Department of the Interior records concerning the operation of concessions in the national parks was "confidential" within the meaning of FOIA exemption 4. After noting that whether the records were customarily treated as confidential was a "relevant inquiry," the court stated that before holding information to be confidential "[a] court must also be satisfied that non-disclosure is justified by the legislative purpose which underlies the exemption." 498 F.2d at 767.
 
 
 45
 Based on its examination of exemption 4's legislative history, the court in National Parks I identified two important purposes served by the exemption: it "encourag[es] cooperation with the Government by persons having information useful to officials;" and "[i]t protects persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication." Id. at 768. With these purposes in mind, the court concluded that "commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future;[17] or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." Id. at 770 (footnote 17 omitted).
 
 
 46
 Since 1975, numerous courts have used the two-prong test announced in National Parks I as a basis for determining whether documents are confidential within the meaning of FOIA exemption 4. See e.g., Orion Research, Inc. v. E.P.A., 615 F.2d 551 (1st Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); American Airlines v. National Mediation Board, supra; Westinghouse Electric Corp. v. Schlesinger, 542 F.2d 1190 (4th Cir.1976), cert. denied, 431 U.S. 924, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); Continental Oil Co. v. F.P.C., 519 F.2d 31 (5th Cir.1975), cert. denied, 425 U.S. 971, 96 S.Ct. 2168, 48 L.Ed.2d 794 (1976).
 
 
 47
 On this appeal the Board maintains that the court in National Parks I erroneously superimposed upon the statutory language of exemption 4 another requirement, i.e., "that documents not be exempt unless exemption was mandated by one of two particular policy interests that were among many reasons why Congress included the exemption." According to the Board, "the National Parks I court arbitrarily selected two particular policy interests that Congress recognized in adopting exemption 4 and elevated them to the equivalent of statutory language."
 
 
 48
 We believe that the Board's analysis of National Parks I is unduly restrictive. In its brief, the Board states that, under National Parks I, government records fall within the ambit of exemption 4 "only in instances where the records contained information that, if disclosed would jeopardize the Government's ability to obtain necessary information in the future or would threaten competitive harm to the submitter." (Emphasis added.)
 
 
 49
 This interpretation of the National Parks I test ignores footnote 17 of that court's opinion, in which it stated:
 
 
 50
 We express no opinion as to whether other governmental interests are embodied in this exemption. Cf. 1963 Hearings at 200 where the problems of compliance and program effectiveness are mentioned as governmental interests possibly served by this exemption.
 
 
 51
 498 F.2d at 770 n. 17 (emphasis added). Thus, in National Parks I, the court recognized the possibility that government interests other than the ability to obtain necessary information in the future could justify non-disclosure under exemption 4.
 
 
 52
 The admonition against viewing the two prongs of the National Parks I test as the exclusive criteria for determining confidentiality under exemption 4 was repeated by the Court of Appeals for the District of Columbia Circuit in Washington Post Co. v. U.S. Dep't of Health and Human Services, 690 F.2d 252 (D.C.Cir.1982). The question presented in that case was whether, under the FOIA, the National Cancer Institute could be compelled to disclose the non-federal employment and financial interests of its consultants. Speaking of the basis for determining confidentiality under exemption 4, the court approved the reasoning of National Parks I, but noted:
 
 
 53
 We reserved in National Parks I, have not since decided, and do not decide here the question "whether other governmental interests are embodied in this exemption." 498 F.2d at 770 n. 17. In particular, we do not decide whether it is proper to take into account the government's need to attract qualified scientists, who might choose not to seek consulting positions in order to avoid public disclosure of Form 474's financial information. The government did not ask us in this case to consider including that specific interest in the National Parks I test.
 
 
 54
 690 F.2d at 268 n. 51. See also National Parks II, 547 F.2d at 678 n. 16.
 
 
 55
 The possibility alluded to in National Parks I and Washington Post became a reality in Comstock International (U.S.A.), Inc. v. Export-Import Bank of the United States, 464 F.Supp. 804 (D.D.C.1979). In Comstock, the District Court for the District of Columbia was called upon to decide whether documents containing information about parties seeking loans from the Export-Import Bank could be withheld from disclosure under FOIA exemption 4. The district court stated:
 
 
 56
 The Court of Appeals in National Parks I suggested that the most common governmental interest threatened by disclosure of commercial and financial information would be the Government's ability to obtain similar necessary information in the future.... This interest is not affected here, for the information contained in the loan agreement is not submitted to the government but rather generated by it through Eximbank's participation in the negotiation process. The National Parks I court, however, expressly left open the possibility that other governmental interests, such as the interest in program effectiveness, are embodied by this exemption....
 
 
 57
 464 F.Supp. at 807-08 (emphasis added). The court proceeded to hold that the likelihood that disclosure would impair the effectiveness of the Eximbank justified treating the requested documents as confidential within the meaning of exemption 4. Id. at 808.
 
 
 58
 The test of confidentiality which is proposed by the Board as a substitute for National Parks I does not resolve the problems that have been presented. To satisfy the first part of the Board's test, i.e., that the submitter expects the information to be treated confidentially, would depend solely on the submitter's subjective intent. This approach to exemption 4 was considered, and, for good reason, rejected by the House Committee on Government Operations in its 1978 Report, in which the Committee stated:
 
 
 59
 disclosure policy cannot be contingent on the subjective intent of those who submit information. For example, it clearly would be inappropriate to withhold all information, no matter how innocuous, submitted by a corporation with a blanket policy of refusing all public requests for information.
 
 
 60
 H.R.Rep. No. 95-1382, 95th Cong., 2d Sess. 18 (1978).
 
 
 61
 The second part of the Board's proposed test, which the Board refers to as the "objective portion" of the test, would require that the information be of a type that is entitled to a reasonable expectation of privacy. The difficulty with this aspect of the Board's test is readily illustrated by the Board's application of its proposed standard to the facts of this case. The Board asserts that the salary information which 9 to 5 seeks "is entitled to a reasonable expectation of privacy by the BSSG inasmuch as private employers like those that comprise the BSSG normally keep such data closely confidential." Thus, the second part of the Board's proposed test would focus on the treatment submitters customarily accord information rather than on the reasons why certain kinds of information should be deemed confidential.
 
 
 62
 A more objective and superior method for determining whether commercial or financial information is confidential within the meaning of FOIA exemption 4 is suggested in National Parks I. The principle to be derived from National Parks I, and the cases which have followed it, is that information will not be regarded as confidential under exemption 4 unless it can be demonstrated that disclosure will harm a specific interest that Congress sought to protect by enacting the exemption. The court in National Parks I identified the two interests which are most frequently threatened by the disclosure of commercial or financial information. However, we do not view National Parks I as imposing a limitation on the number of legitimate interests which are protected by exemption 4.
 
 
 63
 If it can be demonstrated with particularity that a specific private or governmental interest will be harmed by the disclosure of commercial or financial information, the Government should not be precluded from invoking the protection of exemption 4 merely because the asserted interest is not precisely one of those two identified in National Parks I. The emphasis, however, should be placed on the potential harm that will result from disclosure, rather than simply promises of confidentiality, or whether the information has customarily been regarded as confidential. The inquiry in each case should be whether public disclosure of the requested commercial or financial information will harm an identifiable private or governmental interest which the Congress sought to protect by enacting exemption 4 of the FOIA. It is clear that the burden rests with the Government to identify the particular interest, and, also, to demonstrate how that interest will be harmed by public disclosure of the specific information which has been requested.
 
 
 64
 The court in National Parks I specifically noted that the "various exemptions included in the [FOIA] serve two interests--that of the government in efficient operation and that of persons supplying certain kinds of information in maintaining its secrecy." 498 F.2d at 767 (emphasis added). More specifically, the court in that case made the following statement which is very pertinent here:
 
 
 65
 The "financial information" exemption recognizes the need of government policymakers to have access to commercial and financial data. Unless persons having necessary information can be assured that it will remain confidential, they may decline to cooperate with officials and the ability of the Government to make intelligent, well informed decisions will be impaired.
 
 
 66
 Id. (emphasis added).
 
 
 67
 Significantly, the court added that "[t]his concern," that is, the ability of the Government to make intelligent, well-informed decisions, "finds expression in the legislative history as well as the case law." Id.
 
 
 68
 We conclude, therefore, that the district court took a too narrow view of the National Parks I court's use of the term "necessary" in its explanation of exemption 4's confidentiality requirement. That term was meant, we believe, to reflect Congress' purpose to protect information which would be particularly helpful to agency officials in carrying out their mandate. We find no intimation in the FOIA's legislative history that for commercial or financial information to be confidential within exemption 4, it must be "necessary" in the sense of being absolutely essential to the operations of the agency or to the governing process itself.
 
 
 69
 We also see little basis in this case for the district court's distinction between information gathered in the government's official capacity and information gathered in some supposed commercial capacity. The Bank's apparent reason for participating in the Boston Salary Survey Group was to help maintain competitive levels of compensation for its employees. This purpose was in accordance with regulations and policies promulgated by the Board pursuant to its statutory duty to review and approve the salaries paid to employees of the Federal Reserve Banks. These aims are neither so trivial nor so remote from the Bank's and the Board's official purposes as to render exemption 4 necessarily inapplicable. Effective personnel policies and salary structures are legitimate goals of official agencies of this type.
 
 
 70
 In the regular confines of administrative law, courts are generally required to show considerable deference to the decisions of agency officials. In the absence of bad faith or abuse of discretion, it is normally not for a court to substitute its judgment for that of the administrative agency in determining what otherwise appropriate and relevant data is particularly helpful in fulfilling the agency's statutory responsibilities, or in defining the most effective means in acquiring it. Nothing now before us indicates that the Bank sought the salary data for other than a proper purpose, nor that the Board has sought to shield the data in bad faith. Furthermore, there is no suggestion that the Board abused its discretion by allowing the Reserve Bank of Boston to participate in a private salary group that was determined to be the most efficient and cost effective method of obtaining salary data, even though similar data might have been obtained by different means.[3]
 
 
 71
 While there can be no doubt that "the disclosure requirement [should] be construed broadly, [and] the exemptions narrowly," Soucie v. David, 448 F.2d 1067, 1080 (D.C.Cir.1971), courts must nevertheless give effect to both the disclosure requirements as well as to the exemptions set forth in the statute. In view of the legitimate governmental interest of efficient operation, it would do violence to the statutory purpose of exemption 4 were the Government to be disadvantaged by disclosing information which serves a valuable purpose and is useful for the effective execution of its statutory responsibilities.
 
 
 72
 We accordingly vacate the district court's judgment based on its determination that exemption 4 was inapplicable because the information was not necessary. The matter will be remanded to the court for further consideration in light of this opinion. The court remains free to determine that exemption 4 does or does not apply but should consider the matter in accordance with the preceding principles.
 
 Trade Secrets Act
 
 73
 Finally, we turn to the contention of amicus curiae, the Equal Employment Advisory Council (EEAC), that the district court should not have summarily rejected the Board's argument that disclosure of the salary survey data would violate the Trade Secrets Act, 18 U.S.C. Sec. 1905 (Supp. IV 1980). EEAC contends that even if the requested documents are not confidential within the meaning of FOIA exemption 4, the Board may nevertheless be prohibited from disclosing the documents by section 1905.
 
 
 74
 Section 1905 makes it a criminal offense for an officer or employee of the United States to disclose information relating to the trade secrets or confidential business information, including "confidential statistical data," of any person, firm, partnership, corporation or association "to any extent not authorized by law."[4] Section 1905 has been construed to prohibit both unofficial "leaks" by individual Government employees, and formal agency action which results in unauthorized disclosures. See Chrysler Corp. v. Brown, 441 U.S. 281, 298-99 and n. 29, 99 S.Ct. 1705, 1715-16 and n. 29, 60 L.Ed.2d 208 (1979).
 
 
 75
 EEAC argues that despite the similarity in the language of section 1905 and that of FOIA exemption 4, "where a severely restrictive interpretation is given to exemption 4, there remains the possibility that the information is within the ambit of protection provided by section 1905." According to EEAC, this result is possible because section 1905 is a disclosure exemption statute within the meaning of FOIA exemption 3, 5 U.S.C. Sec. 552(b)(3), which provides that the FOIA's disclosure mandate does not apply to matters that are specifically exempted from disclosure by another statute.
 
 
 76
 Whether section 1905 is an exempting statute referred to in FOIA exemption 3 has not been finally resolved, see Chrysler v. Brown, 441 U.S. 281, 319 n. 49, 99 S.Ct. 1705, 1726 n. 49, 60 L.Ed.2d 208 (1979), and we need not decide it here. For the purpose of argument, however, it may be assumed that section 1905 is an exempting statute. Nevertheless, in this case, section 1905 cannot serve as a basis for prohibiting disclosure.
 
 
 77
 Section 1905 only prohibits information disclosures not authorized by law. The FOIA expressly authorizes the disclosure of all government information that is not exempted from disclosure by one of the nine exemptions enumerated in the FOIA. Thus, the district court correctly observed that "[o]nly the disclosure of information which fits into one of the nine exemptions of Sec. 552(b) may constitute unauthorized disclosure and thus may activate the provisions of the Trade Secrets Act." 527 F.Supp. at 1167.
 
 
 78
 This result was anticipated by Congress when it amended FOIA exemption 3 in the 1976 Government in the Sunshine Act. P.L. No. 94-409, Sec. 5(b), 90 Stat. 1241, 1247 (1976). The House Report stated:
 
 
 79
 [T]he Trade Secrets Act, 18 U.S.C. Sec. 1905 which relates only to the disclosure of information where disclosure is "not authorized by law," would not permit the withholding of information otherwise required to be disclosed by the Freedom of Information Act, since the disclosure is there authorized by law. Thus, for example, if material did not come within the broad trade secrets exemption contained in the Freedom of Information Act, section 1905 would not justify withholding; ...
 
 
 80
 H.R.Rep. No. 94-880 Part I, 94th Cong., 2d Sess. 23 (1976), reprinted in 1976 U.S.Code Cong. & Ad.News 2183, 2205. See also J. O'Reilly, Federal Information Disclosure Sec. 13.06 (1982). Consequently, if the government cannot prove that the requested documents are within FOIA exemption 4, their disclosure will not violate section 1905. If the documents are found to be exempt from disclosure under the FOIA, they will not be disclosed and no question will arise under section 1905. Therefore, the district court correctly dismissed the Board's section 1905 contention.
 
 
 81
 The judgment of the district court is vacated, and this action is remanded so that the district court may determine, consistent with this opinion, whether the requested information is confidential within the meaning of exemption 4 of the FOIA.
 
 
 82
 It is so ordered.
 
 
 83
 BREYER, Circuit Judge (dissenting).
 
 
 84
 While I agree with most of the majority opinion, I disagree with the result. I think it unlikely that the district court, on remand, will find a policy reason strong enough to prevent disclosure; I would affirm its judgment now.
 
 
 85
 National Parks and Conservation Association v. Morton, 498 F.2d 765 (D.C.Cir.1974) and the majority's opinion make clear that Congress did not intend to apply the word "confidential" automatically whenever an agency official agrees to a business request to keep information confidential. Otherwise, given the temptation of government and business officials to follow the path of least resistance and say "confidential" whenever they seek to satisfy the government's vast information needs, the exemption would expand beyond what Congress intended. Thus, National Parks (which I agree is illustrative and does not lay down a dispositive test) looked beyond the simple promise of confidentiality and examined whether either the business or government had a legitimate interest in ascribing confidential status to the information. And, the majority holds that the government can invoke the exemption only if it shows how disclosure will significantly harm some relevant private or governmental interest.
 
 
 86
 The record, in my view, shows that the legitimate business and governmental interests against disclosure are unusually weak in this case. First, the BSSG has entered into a consent decree with the Attorney General of Massachusetts promising to make all future anonymous salary compilations public. It is not obvious why there would be a significantly greater need to keep past compilations private. Moreover, as the Commonwealth's suit against the BSSG suggests, employers who collect cost information, circulate it only among themselves, and deny others access to it, risk antitrust difficulties. Their practice may be viewed as an agreement among buyers of a factor (secretarial services), see Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); Cordova v. Bache & Co., 321 F.Supp. 600 (S.D.N.Y.1970); 1 P. Areeda & D. Turner, Antitrust Law p 229a (1978), to circulate price information, see United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); Sugar Institute, Inc. v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936); American Column & Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921); Tag Manufacturers Institute v. FTC, 174 F.2d 452 (1st Cir.1949); P. Areeda, Antitrust Analysis ch. 3C (3d ed. 1981), where the purpose or effect of the agreement is to suppress competition and where the agreement provides no offsetting benefit through the public dissemination of the information. I do not know whether the Commonwealth Attorney General would have proven such an antitrust violation in his suit, for the parties settled the case by consent decree. But, the legitimate business need for confidentiality is far from obvious in the case of a confidential salary information-sharing agreement among competitors.
 
 
 87
 Second, the government's need for confidentiality seems slight. The government activity at issue--the setting of salaries--is peripheral to the main job of the Federal Reserve Board and its regional banks. Normally government salary setting is conducted in public. Of course, the Federal Reserve Banks set their salaries differently and they are authorized by the Board to find out what comparable businesses pay their workers. But, these facts do not show any special need to enter into what was evidently a legally questionable, private salary information-sharing agreement among various competing organizations. Rather, the only interest to which the government can point is its general interest in keeping a promise of confidentiality--an interest that is at stake whenever a promise of confidentiality is made, but an interest that is weakest when the information is related as peripherally to the agency's main mission as it is here. To accept the threat to this interest as determinative in this case would come close to making a simple "request plus promise" necessarily sufficient to apply the "confidentiality" exemption.
 
 
 88
 In the majority's view, these matters are better explored on remand. However, this litigation over a few documents has gone on for some time. It has been the subject of several district court opinions. No information of great moment is involved. And, the fact that a directly related state court consent decree exists prevents the case from having much precedential significance. It thus seems to me better to settle the matter now than to remand the case for yet another district court determination, another opinion, and possibly still another appeal. The government has had sufficient opportunity to demonstrate its interest in the confidentiality of the information. I do not think it has done so adequately. It is unlikely that the district court can reach a different result under the standards the majority instructs it to apply. Therefore, I would simply affirm the district court's result.
 
 
 
 *
 The Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 See Vaughn v. Rosen, 523 F.2d 1136 (D.C.Cir.1975)
 
 
 [2]
 In the special circumstances of this case, we reject 9 to 5's argument that because the Board did not oppose the National Parks I standard below, we should not now consider the Board's opposition to that standard. Here we believe it will help explain our construction of section 552(b)(4), if we discuss the merits of the Board's contention that National Parks I is flawed. As we ultimately reject the Board's view and accept the National Parks I formulation, there is no unfairness to the parties. As Justice Blackmun observed in Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877 (1976): "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." See United States v. Krynicki, 689 F.2d 289, 291 (1st Cir.1982); United States v. Golon, 511 F.2d 298, 300-01 (1st Cir.), cert. denied, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975)
 
 
 [3]
 While Judge Breyer's dissent suggests that the BSSG's contract requirement that the information should be kept confidential may be against public policy and thus, unenforceable, we do not understand the district court decision to rest on that point. To the extent this issue is not precluded by the Massachusetts attorney general's consent decree, the district court, of course, may consider it on remand
 
 
 [4]
 18 U.S.C. Sec. 1905 provides: Whoever, being an officer or employee of the United States or of any department or agency thereof, or agent of the Department of Justice as defined in the Antitrust Civil Process Act (15 U.S.C. 1311-1314), publishes, divulges, discloses or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment